

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-25-00113-CV
_____


IN THE INTEREST OF B.G.T. AKA E.T., A CHILD


On Appeal from the County Court at Law No. 2
Gregg County, Texas
Trial Court No. 2024-598-CCL2


Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens
Concurring Opinion by Justice Rambin

MEMORANDUM OPINION

Mother appeals from the trial court's termination of her rights to her child, E.T.,[1] arguing that the evidence did not support the finding that termination was in E.T.'s best interest. Mother does not challenge the trial court's predicate findings that she engaged in several of the listed grounds for termination, specifically that she: (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child; (3) constructively abandoned the child who had been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and the Department had made reasonable efforts to return the child to Mother; (4) and used a controlled substance, as defined by Chapter 481 of the Texas Health and Safety Code, in a manner that endangered the health or safety of the child, and failed to complete a court-ordered substance abuse treatment program. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O) (Supp.). Rather, Mother argues only that the trial court erred by finding that it was in E.T.'s best interest to terminate Mother's parental rights. *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (Supp.).

Because we find the evidence sufficient to support the best-interest finding, we affirm the trial court's decision.

---

[1] To protect the child's identity, we use initials for the child and pseudonyms for her family members. *See* TEX. R. APP. P. 9.8.

## I. Background

The Department filed its "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship" on April 19, 2024, two days after E.T.'s birth, asserting that the Department received an intake form the day after E.T. was born to notify the Department that E.T. tested positive for amphetamine. Mother also tested positive for amphetamine and had previously tested positive for drugs at three prenatal visits.

A final hearing was held on October 7, 2025. The testimony shows that during the pendency of the case, Mother continued to test positive for marihuana metabolite, methamphetamine, and amphetamine. According to Julia Ryner, an intake specialist for the Department, Mother had been using methamphetamine since the age of sixteen. The Department intervened when E.T. and Mother both tested positive for drugs at E.T.'s birth. While E.T. did not show signs or symptoms of withdrawal in the hospital, the concerns surrounding Mother's drug abuse and failure to treat her mental-health issues caused the Department to seek removal of E.T. When Mother was medicated for her mental health, it was stated that she did "really well."

Ryner testified that Mother lived with her father and grandfather, and her father was a known drug addict as well. Ryner explained that the Department found that the home environment where E.T. would have been expected to live with Mother and her father was unsafe. The Department's investigation determined that, given Mother's continuing addiction to methamphetamine, she would not be able to safely care for E.T., and that Mother's behaviors, including her untreated bipolar disorder, endangered E.T.

Joi Granville, a permanency specialist at 4Kids4Families, testified that a family plan of service was developed for Mother on June 6, 2024. An additional service plan was developed on June 26, 2024, and made into a court order in October 2024, at a permanency hearing. Granville said that Mother "was ordered a psychological and to follow all recommendations from the psychological evaluation. She was ordered a substance abuse assessment and to follow all recommendations from that assessment. She was ordered parenting, as well as random drug testing." According to Granville, Mother did not do well on her service plan—including testing positive or refusing to test for numerous drug tests. Mother's failure to progress on her plan led to an order suspending her visitation with E.T. Mother did not complete any of her services. Mother was also incarcerated during the pendency of the case, including during the final hearing. She was awaiting transfer to a mental-health facility, having been found mentally unstable to stand trial. Though there was evidence that Mother may have begun some of her services, Granville stated that Mother specifically told her "that she is not a server, so she does not want to work services."

As it pertained to E.T.'s placement with her maternal aunt and uncle, T.B. and B.B., Granville explained that all of E.T.'s needs were being met, E.T. is bonded with her family, and the aunt and uncle are capable of and intend to make E.T.'s placement as permanent as E.T. may need.[2] T.B. also testified. T.B. explained that Mother is her niece and that she has witnessed Mother's addiction and mental-health issues since Mother was a teenager. T.B. stated that

---

[2]E.T.'s biological father, T.P., was determined via DNA testing during the pendency of the case. Though he is not a party to this appeal, we note that he actively participated in and completed his family service plan once he was determined to be E.T.'s father. Father has regular supervised visitation with E.T. and was made a joint-managing conservator of E.T.

4

Mother has never shown an ability to independently take care of her own mental health and medications on an outpatient basis. T.B. and B.B. had cared for E.T. for the eighteen months preceding the final hearing and expressed an interest in permanent placement.

Noting that Mother had not done anything to cure any of the issues that led to E.T.'s removal, both Ryner and Granville said that it was in the E.T.'s best interests to terminate Mother's parental rights to E.T. Specifically, as it related to the best interests of E.T., Brooke Turner Ebarb, a CASA volunteer who had worked the case from the outset, testified that Mother "is unable to provide a safe and stable environment for" E.T. Ebarb also recommended termination of Mother's parental rights to E.T., regardless of whether Mother changes in the future.

At the close of the final hearing, the trial court found "by clear and convincing evidence that the termination of the parent-child relationship between [Mother] and . . . E.T. to be in the child's best interest."

## II.    Termination Was in the Best Interest of E.T.

### A.    Standard of Review

"Proceedings to terminate the parent–child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] child[] . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65, (2000)

5

(plurality op.). As a result, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Thus, "[i]nvoluntary severance of parental rights thus requires 'clear and convincing evidence' that termination is warranted and in the child's best interest." *In re A.C.*, 560 S.W.3d at 626 (quoting TEX. FAM. CODE ANN. § 161.001; *Santosky v. Kramer*, 455 U.S. 745, 748 (1982)). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Supp.); *see In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam). Therefore, this Court is required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014).

Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "the rights of natural parents are not absolute; protection of the child is paramount." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)).

In determining the best interests of the child, courts consider the following *Holley*[3] factors:

> (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the

---

[3]*See Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976).

6

programs available to assist these individuals; (6) their plans for the child; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

*In re A.A.*, 670 S.W.3d 520, 534 n.57 (Tex. 2023) (citing *Holley*, 544 S.W.2d at 371–72). As noted, this list of factors is not exhaustive, and evidence is not required on all of the factors to support a finding that terminating a parent's rights is in the child's best interest. However, "the *Holley* factors are not a checklist." *In re C.C.*, 720 S.W.3d 41, 59 (Tex. App.—Texarkana 2025, no pet.). "Consequently, the fact-finder may choose to give greater weight to one factor over others." *Id.* (citing *In re C.H.*, 89 S.W.3d at 27). Further, in the best-interest analysis, we may consider evidence used to support the grounds for termination of parental rights. *In re C.H.*, 89 S.W.3d at 28.

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that" termination of the parent-child relationship was in the best interests of the child. *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209

S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine '"whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations."'" *Id.* (alteration in original) (quoting *In re H.R.M.*, 209 S.W.3d at 109 (quoting *In re C.H.*, 89 S.W.3d. at 25) (citing *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002))).

"If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). To make "this determination," we "undertake '"an exacting review of the entire record with a healthy regard for the constitutional interests at stake."'" *Id.* (quoting *In re A.B.*, 437 S.W.3d at 503 (quoting *In re C.H.*, 89 S.W.3d at 26)).

## III.    Analysis of the *Holley* Factors

At the time of termination, E.T. was too young to directly express her desires. Generally, when a child is too young to express her desires, this factor is considered neutral. *See In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.). However, "[w]hen children are too young to express their desires, the factfinder may consider whether the children have bonded with the [proposed adoptive] family, are well cared for by them, and [whether they] have spent minimal time with a parent." *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "A child's need for permanence through the establishment of a 'stable, permanent home' has been recognized as the paramount consideration in a best interest determination." *Id.* (quoting *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no

8

pet.)). "Therefore, evidence about the present and future placement of the child is relevant to the best-interest determination." *Id.* (citing *In re C.H.*, 89 S.W.3d at 28).

A child needs a safe and stable home. *See* TEX. FAM. CODE ANN. § 263.307(a) ("prompt and permanent placement of the child in safe environment is presumed to be in the child's best interest"); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (a parent who lacks ability to provide a child with a safe and stable "home is unable to provide for [the] child's emotional and physical needs"). At the time of the final hearing, Mother was incarcerated and pending transfer to a mental-health facility. The testimony reveals that Mother was found unable to stand trial in her criminal case for which she was incarcerated during the final hearing due to her mental state, and there was no timeline as to when, or even if, she would be released from the mental-health facility. As such, there was no indication of a time now, or in the future, that Mother could provide a safe and stable home for E.T.

In stark contrast, E.T.'s placement with T.B. and B.B. was described through the testimony as safe, appropriate, and free of any hazards for the child. E.T. also showed indications of a strong bond with her aunt and uncle. Ebarb stated that the home was safe and loving and allowed E.T. to thrive. That evidence supports the trial court's best-interest determination as it relates to the first three and the seventh *Holley* factors.

The trial court was also presented with evidence regarding Mother's consistent drug use and criminal activity, before and during the pendency of the case. *See In re C.V.L.*, 591 S.W.3d 734, 756 (Tex. App.—Dallas 2019, pet. denied) (agreeing that a parent's narcotics use constituted an adverse factor to be considered in best-interest analysis). "Intentional criminal

9

activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child." *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc) (citing *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) ("[I]mprisonment is certainly a factor to be considered by the trial court on the issue of endangerment." (alteration in original))). Evidence of continued criminal conduct, including several periods of incarceration, can support a trial court's conclusion that termination is in the child's best interests. *See In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (noting evidence of parent's "inability to maintain a lifestyle free from arrests and incarcerations" is "relevant to a best interest determination").

The evidence of Mother's continued criminal conduct and drug use supports the trial court's best-interest finding as it relates to the fourth *Holley* factor. *See In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *7 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.) (concluding father's series of crimes, including drug-related offenses and domestic violence occurring before and after children's births, supported trial court's best-interest finding); *In re D.M.*, 58 S.W.3d at 814.

The failure to comply with a service plan can also support the trial court's best-interest finding. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). Mother failed to follow her service plan. She did not participate in parenting education classes, complete a drug assessment, or submit to random drug testing. A parent's partial compliance with service requirements set out in a court order is not enough to avoid a termination finding. *See In re M.C.G.*, 329 S.W.3d 674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Mother's repeated failure to

10

submit to drug testing is of particular concern in light of the initial removal stemming from E.T. testing positive for drugs at birth. That evidence related to the fifth *Holley* factor supports the trial court's finding.

As to the sixth factor, the proposed placement and plan for E.T., the Department introduced a settlement agreement that was reached between T.B. and B.B. with Father. The agreement named T.B. and B.B. as managing conservators of E.T., along with Father as a joint-managing conservator. All parties agreed that that would be the best path forward for E.T., would provide safety and stability in E.T.'s life, and would allow E.T. regular contact and bonding with her father. The trial court could have reasonably determined that the settlement agreement, reached by those caring for E.T. and providing a safe and loving home for her, was in the best interest of E.T.

The final two *Holley* factors relate to Mother's acts and/or omissions, which may indicate the existing parent-child relationship is improper, and any excuse for those acts and/or omissions. The trial court had before it evidence that E.T. tested positive for amphetamine at birth, a drug Mother was known to abuse. The testimony reveals that Mother had an untreated mental illness, a history of drug use, and a criminal history that had her incarcerated at the time of the final hearing. Mother's release date could not be determined as she awaited transfer to a mental-health facility to determine if her mental capacity could be restored to stand trial in the criminal case for which she was incarcerated at the time of the final hearing. Mother failed to complete her services before her incarceration and failed to remain drug-free and stable. There

11

were no excuses provided to explain Mother's actions. As a result, the final two factors support the trial court's finding that termination was in E.T.'s best interest.

As such, after an exacting review of the record, we find that a fact-finder could reasonably have concluded that Mother's lack of stability, untreated mental-health issues, drug use, and failure to comply with her service plan supported the finding that termination was in E.T.'s best interest. *See L.Z. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-12-00113-CV, 2012 WL 3629435, at *10–11 (Tex. App.—Austin Aug. 23, 2012, no pet.) (mem. op.) (holding the best-interest finding was supported where father had a history of instability, domestic violence, and criminal activity, and child's foster family planned to adopt the child).

Considering the entire record, and after viewing all of the evidence in the light most favorable to the best-interest finding, we conclude that the evidence was sufficiently clear and convincing such that a reasonable fact-finder could have formed a firm belief or conviction that termination of the parent-child relationship between Mother and E.T. was in the child's best interests. Accordingly, we overrule Mother's issue.

## IV. Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

12

CONCURRING OPINION

In the trial court, and here, Mother (or more specifically Mother's counsel) asked a focused question: Why not greatly restrict Mother's parental rights, and thereby give Mother more time to turn things around? As stated in Mother's summary of the argument: "The evidence presented at trial favored making [Mother] a possessory conservator with no rights to E.T., rather than termination of [her] parental rights." The consequence of termination is that "Mother will officially cease to be Daughter's *mother*." *In re G.A.M.*, 692 S.W.3d 336, 343 (Tex. 2024) (orig. proceeding) (Young, J., joined by Devine, Blacklock, and Busby, JJ., concurring to denial of petition for review).

In this case, there was no need to terminate Mother's parental rights as a prerequisite to adoption. There could be no adoption because, by the agreement described above, Father's parental rights were not terminated. Nor was there a need to terminate Mother's parental rights to prevent Mother from ever having access to E.T. Indeed, the Department anticipated that even if terminated, Mother would have access to E.T., at the discretion of T.B. and B.B., as well as the discretion of Father. So, to restate the question: Given that there is no need to terminate to facilitate an adoption, and given that paths to future access are open, why permanently foreclose Mother's constitutional rights?

The Department's answer to that question focused largely on the past. Mother's conduct and E.T.'s circumstances, from pregnancy to the termination hearing, supported termination. Mother conceded multiple grounds for termination.

13

As for the present, the evidence at the termination hearing was undisputed: Mother was in jail, awaiting transfer to a mental facility. The psychological evaluation in the criminal case was discussed at the termination hearing. That evaluation was conducted roughly six weeks prior to the termination hearing (August 29 to October 7, 2025). That evaluation found that Mother was "unable to rationally discuss evidence in her case," and "[could not] engage in reasoned choice[s] regarding legal strategies and options." That evaluation, however, expected things to change: "[Mother] requires inpatient psychiatric care and competency restoration and with same will become competent in the foreseeable future."

As for the future, the Department's evidence was less sure. Mother's counsel drilled down on the point in this exchange:

> Q. [(BY MOTHER'S COUNSEL:)] So how does my client having the right to have information about her child, know how she is doing in school, how would that significantly impair the child?
>
> A. [(BY GRANVILLE:)] I believe during this -- the Department believes during this case, [Mother] did not work her services; she did not prove that she could be -- you know, take on this parenting aspect.
>
> Q. Well, I understand. Every time I ask you about best interest, you want to give me answers that are grounds for termination. Okay. So let's say we've got grounds for termination, why is that in her best interest? Why is termination in the child's best interest?
>
> A. Because [Mother] hasn't shown that she can adequately care for her child.
>
> Q. And she's not asking to do that. She's incarcerated. She's not asking to remove the child from [T.B. and B.B.]
>
> A. Yes, ma'am.

14

Q.      She's just asking for her parental rights to remain intact should she get to the point that she can have a reasonable relationship with her child?

A.      Right.  At this time, she is incarcerated.  But she has not been incarcerated the entirety of this case.

Q.      Correct.  Once again, you may have grounds for termination.  I'm just trying to find out why that is in [E.T.'s] best interest.

[Counsel for Department]:      Your Honor, I know [Mother's counsel] doesn't like the answer, but she's gotten it about five times.  So I'm going to object to asked and answered.

Trial Court:    I'll allow one more question.

Q.      (By [Counsel for Mother:])  So not referring to the grounds, the fact that she didn't complete her service plan or whatever other grounds you want to talk about, why is termination in [E.T.'s] best interest?

A.      I'm trying to figure out how to word it without giving you the same answer.  I mean, termination not being given -- I mean, from [Mother] not being terminated could put [E.T.] in unforeseen circumstances and, you know, could lead to her being in harm and danger.

Q.      In what manner?

A.      Unsure.  It could be unsure.

Q.      So if [T.B. and B.B.] and [Father] were competent to safely protect [E.T.], you're just merely speculating that something could happen?

A.      Based on the things that have occurred over the longevity of this case, you know, we are unsure what could happen.

The question, as framed by Mother, merits examination.

*In re G.A.M.* involved a twenty-two-year-old mother, the same age as Mother here.  *In re G.A.M.*, 692 S.W.3d at 337.  The mother in *In re G.A.M.* had suffered a traumatic-head injury

15

when she was four years old and had numerous cognitive deficiencies. *Id.* Regarding her ability to care for her child, the result was "never a lack of love, but frequently a lack of capability." *Id.*

Mother here is not so sympathetic a figure. But she is young, and though much of the past and present is her own doing, there was testimony that Mother had a difficult childhood. Counsel for Mother developed this when questioning the Department's witness regarding the removal affidavit and Mother's methamphetamine use beginning at age sixteen:

> Q.  Your affidavit refers to some exposure to [Mother] when she was a minor. I think you state that her father supplied her with alcohol and cigarettes; is that correct?
>
> A.  [(BY RYNER:)]   Yes.
>
> Q.  And he was a drug user as well?
>
> A.  To my knowledge, yes.
>
> Q.  And her mother as well?
>
> A.  To my knowledge, yes.
>
> Q.  So she was exposed to a lot of this stuff when she was just still a minor; is that correct?
>
> A.  Yes.
>
> Q.  Would you agree that, not only her being so young, but that would be difficult to overcome in that environment?
>
> A.  Absolutely.
>
> Q.  Was there also allegations of sexual abuse against her?
>
> A.  Yes.
>
> Q.  And it had been your experience that traumatic events like that might trigger an addiction?

A.    Yes.

Additional evidence adduced at the termination hearing established that, at the time of removal, Mother had been prescribed medication for bipolar disorder. Mother, though, had a history of not managing her medication on her own. While pregnant with E.T., at a family Thanksgiving gathering, Mother "was having some bizarre behaviors, talking in a language that was not understood by anybody else." In sum, the record reflects a history of mental illness. But as noted above, the psychologist who conducted the evaluation for Mother's competency for her criminal trial concluded that, with inpatient psychiatric care, Mother's condition would improve, at least for the purposes of competency to stand trial.

Which brings this back around to the consideration of "*alternative remedies*" when competency is at issue in parental rights termination cases. *Id.* at 342 (quoting *In re E.L.T.*, 93 S.W.3d 372, 380 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (Guzman, J., concurring)). Going beyond the statutory deadline to conclude termination cases is not an available alternative. *In re R.M.T.*, 352 S.W.3d 12, 19, 23 (Tex. App.—Texarkana 2011, no pet.). But there is an argument to be made that the Legislature should grant trial courts discretion to do so. *See id.* at 27 (Carter, J., concurring). The concurring opinion in *In re G.A.M.* pondered whether the Legislature could create a path to adoption without terminating the rights of loving parents who, due to disability, were unable to care for their child. *In re G.A.M.*, 692 S.W.3d at 342.

Here, Mother raised the question of whether, via the preservation of highly restricted parental rights, the door might be left open to the possibility, even if slight, that Mother might turn things around. It is true that evidence regarding grounds for termination can also be used in

the best-interest inquiry. *In re C.C.*, 720 S.W.3d at 65 (quoting *In re C.H.*, 89 S.W.3d at 28). But it is also true that termination is the last resort. *D.V. v. Tex. Dep't of Fam. & Protective Servs.*, 722 S.W.3d 854, 861 (Tex. 2025) ("Because termination is *always the last resort*, it is to be hoped that the department can abandon a request for termination in many cases. Abandonment of that dire remedy should not be met with skepticism . . . ." (emphasis added)). Mother's question is consistent with termination being the last resort. As shown above, the Department was "unsure" in its answer.

Ultimately, on this record, I join in affirming termination. The *Holley* best-interest factors are "not a checklist," and the trial court could have weighed some factors more than others. *In re C.C.*, 720 S.W.3d at 59 (quoting *In re C.H.*, 89 S.W.3d at 27). In our review, we show deference to the role of the trial court as fact-finder, and presume that the trial court, where permissible to do so, drew reasonable inferences in favor of the judgment and resolved disputes in the evidence in favor of the judgment. *Id.* at 54–56. Though I concur to highlight the rights of the Mother, it must be said at the same time that: "Like their parents, children have a compelling interest in finality and stability." *In re D.S.*, 602 S.W.3d 504, 512 (Tex. 2020).

The closing words of the concurring opinion in *In re G.A.M.* are fitting here too, and as I cannot improve upon them, I borrow them: "I therefore concur, even as I express my concern for the rights of all involved, with an eye toward future cases." *In re G.A.M.*, 692 S.W.3d at 343.

Jeff Rambin
Justice

Date Submitted:    February 13, 2026
Date Decided:    April 21, 2026